**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24-CR-131 (BAH)** |
| **JAMES WEEKS,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence James Weeks to 27 months' imprisonment—the midpoint of the applicable Guidelines range—three years' supervised release, $2,774 in restitution and a $100 special assessment.

### I.      INTRODUCTION

The defendant, James Weeks, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

Weeks, a former corrections officer and government employee from northern New York, traveled to the Capitol with his brother, Troy Weeks. At approximately 3:00 p.m. that afternoon, Weeks entered the Lower West Terrace "tunnel" where hundreds of rioters were relentlessly attacking police guarding the entrance to the building. Weeks spent approximately four minutes inside the tunnel and did a substantial amount of damage during that time. For example, he screamed at a nearby police officer who was deploying OC spray that he would "shove that [OC spray can] up your ass" and called the officer a "fat fuck!" Weeks also answered calls from other rioters to open one of the doors in the tunnel, which gave the mob unfettered access to attack more police officers. After opening the door, Weeks himself attacked MPD Sergeant J.M. inside the tunnel. Weeks left the tunnel after four minutes only because another rioter sprayed him in the face with chemical irritant. But Weeks did not leave Capitol grounds after leaving the tunnel. Instead, Weeks walked up to the Upper West Terrace, closer to the Capitol building, where he and a crowd of people broke a window leading into the building near the Senate Wing Door.

The government recommends that the Court sentence Weeks to 27 months of incarceration. A 27-month sentence reflects the seriousness of Weeks' conduct on January 6, his abuse of power as a former law enforcement officer, and his lack of remorse for his conduct.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Offense filed in this case, ECF No. 33, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. The majority of Weeks' criminal conduct occurred inside the Lower West Terrace "tunnel." Exhibit A is a video compilation that shows the timeline of events at the tunnel on January 6, 2021.[2]

### B.  Weeks' Role in the January 6, 2021 Attack on the Capitol

On the morning of January 6, 2021, James Weeks attended the Stop the Steal rally at the Ellipse with his brother, Troy Weeks.[3]  James Weeks wore a purple baseball cap with a large white "C" on it, a red bandana, a green jacket over a bright red sweatshirt, jeans and tan tennis shoes.



*Image 1: Still image from TikTok video of Weeks at the Stop the Steal rally*

---

[2]  The government's sentencing exhibits will be provided separately to defense counsel and the Court via the government's file-sharing platform.
[3]  Troy Weeks pled guilty to violating 18 U.S.C. § 111(a) in *United States v. Tryon-Castro et. al.*, 23-CR-35 (RC). He is awaiting sentencing.

3

As Weeks made his way from the Ellipse to the U.S. Capitol, he passed the Peace Circle, where a loud crowd was gathered and a man declared over a megaphone, "Stop the vote on the electoral ballots!" *See* Exhibit J, open-source video, at timestamp 00:06. Weeks stopped to listen to the speaker at a metal barricade that bore an "AREA CLOSED" sign on it.



*Image 2: Still image from Exhibit J at timestamp 00:22 showing Weeks standing at a barricade next to an "AREA CLOSED" sign*

By the time Weeks reached the Capitol grounds, the crowd on the West Front was huge. He and his brother waded through the crowd to get closer to the building.



*Image 3: Still image from open-source video showing Weeks wading through the dense crowd on the West Front of the U.S. Capitol*

Weeks pushed his way to the northwest scaffolding, and climbed the stairs to the Inaugural

Stage. Once he reached the stage, he again pushed through the dense crowd toward the tunnel.



*Image 4: Still image from open-source video showing Weeks pushing through the crowd on the side of the Inaugural Stage*

By the time Weeks arrived at the entrance to the tunnel, at approximately 3:00 p.m., there were already thousands of people on the Inaugural Stage, and rioters inside of the tunnel were visibly assaulting the line of police officers trying to hold the mob back from entering the Capitol building there. *See* Exhibit B, open-source video.



*Image 5: Still image from Exhibit B at timestamp 00:15 of Weeks entering the tunnel*

Despite this violence, Weeks entered the tunnel at approximately 3:02 p.m.



*Image 6: Still image from CCTV at 3:02:04 showing Weeks' entering the tunnel*

After entering the tunnel, Weeks pushed his way through the crowd toward the police line, which was located just behind the first set of gold double-doors. One of the doors was closed (though its glass had been shattered), creating a partial barrier which separated police from the rioters. *See* Exhibit C, open-source video. As Weeks moved forward, other rioters around him

called out "we need fresh people!" *Id.* at timestamp 00:19. Then as Weeks approached the shut

door, his brother, who was in front of him in the tunnel, turned and called out to the crowd,

"Alright! Get ready to push! C'mon!" Exhibit D, open-source video, at timestamp 00:05. Weeks

then turned to the crowd and yelled, "everyone! Push!" as he waved his hand forward toward the

police. *Id.* at 00:08.



*Image 7: Still image from Exhibit C at timestamp 00:30 showing Weeks yelling at other rioters to "Push!"*

Weeks and his brother then pushed against the police. In response, one of the police

officers, MPD Sergeant W.B., extended a can of OC spray toward the rioters pushing against them.

Weeks then reached through the closed door's broken windowpane as if to snatch the OC spray

out of the officer's hand. While doing so, he screamed, "I'm going to shove it up your ass! You

fat fuck! I'm going to shove that up your ass! We're going to fuck you up!" Exhibit E, open-source

video, at timestamp 00:01.



*Image 8: Still image from Exhibit E at 00:01 showing Weeks pointing and screaming at MPD Sergeant W.B.*

Seconds later, Weeks began to move around the closed door, closer to the police. A nearby rioter called out, "get that door open!" *Id.* at timestamp 00:23. In response, Weeks moved around the door, turned his back to the police line and pushed the door open.



*Image 9: Still image from Exhibit E at timestamp 00:28 showing Weeks pushing the door open*

        After he pushed the door open, the crowd surged forward, giving more rioters direct access

to assault police officers. *Id.* at 00:36. Weeks joined the crowd and also rushed at police officers.



*Image 10: Still image from Exhibit E at timestamp 00:45 showing Weeks engaging with officers*

Body-worn camera footage from MPD Sergeant J.M. shows Weeks charging at him, almost immediately after Weeks opened the gold-colored door. *See* Exhibit F, Sergeant J.M.'s body-worn camera footage.



*Image 11: Still image from Exhibit F at timestamp 15:03:33 rushing MPD Sergeant J.M.*

CCTV footage from this same time also shows Weeks as he came around the door and immediately struck out with his left hand in the direction of officers (who are obscured from view by the second set of gold doors). *See* Exhibit G, CCTV footage from inside the tunnel.



*Image 12: Zoomed in still image from Exhibit G at 3:03:34 showing Weeks striking out at officers with his left arm*

In fact, Sergeant J.M.'s body-worn camera showed Weeks was still near him and pushing against him approximately 13 seconds later at 15:03:46.

12



*Image 13: Still image of Exhibit F at timestamp 15:03:46 showing Weeks' arm, recognizable by his green jacket sleeve in the upper righthand corner of the screen, pushing against Sergeant J.M.*

Soon after this, another rioter behind Weeks sprayed what appeared to be chemical irritant at the police line, hitting Weeks directly in the face.



*Image 14: Still image from Exhibit E at timestamp 00:46 showing Weeks being sprayed with a chemical irritant by another rioter*

Despite being sprayed, Weeks continued to fight against the police for several more seconds before making his way back toward the entrance to the tunnel, with his eyes clenched tightly shut. *See* Exhibit H, open-source video.

14



*Image 15: Still image from Exhibit H at timestamp 00:03 showing Weeks leaving the tunnel with his eyes clamped shut*

Weeks left the tunnel at 3:06 p.m.



*Image 16: Still image from CCTV footage showing Weeks leaving the tunnel*

Some time after leaving the tunnel, Weeks made his way up onto the Upper West Terrace, and joined a crowd gathered around a window into the Capitol building near the Senate Wing

Door. As Weeks watched, one rioter climbed up onto the windowsill and kicked the door forcefully with the heel of his shoe repeatedly. When the rioter was unable to break the window, Weeks turned to the crowd, gestured with his head toward the window, and called out "volunteers [inaudible]!" signaling other rioters to move up and help break the window. *See* Exhibit I, open-source video, at timestamp 00:18. Two more rioters then joined the first at the window, with one rioter climbing up and trying to hit the glass out while another used the butt of a flagpole with the American flag to strike the window. *Id.* at 00:28. Ultimately, one of the rioters was successful in breaking part of the window open by kicking it with his foot. *Id.* at 00:34. When the window broke, Weeks cheered. *Id.* Seconds later, Weeks approached the window and waved what appears to be a can of law enforcement OC spray through an open slat in the window. *Id.*



*Image 17: Still image from Exhibit I at timestamp 00:47 of Weeks waving a stolen can of OC spray in the opening of the window*

Weeks proceeded to forcefully bang the can of OC spray against the side of the window opening several times, *id.* at 00:53, then used a small stick to bang against the side of the window

that was not already broken, *id.* at 1:00. Another rioter with a flagpole then approached and struck the same pane of the window that Weeks was striking, and the windowpane broke. *Id.* at 1:04.

### III.    THE CHARGES AND PLEA AGREEMENT

On March 13, 2024, a federal grand jury returned an indictment charging James Weeks with eight counts, including, assaulting, resisting and impeding law enforcement officers, in violation of 18 U.S.C. § 111(a). On June 27, 2024, Weeks was convicted of that offense based on a guilty plea entered pursuant to a plea agreement.

### IV.    STATUTORY PENALTIES

Weeks now faces sentencing on his conviction for assaulting, resisting and impeding law enforcement officers, in violation of 18 U.S.C. § 111(a).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government agrees with the Guidelines calculation set out in the PSR, namely:

Count Two: 18 U.S.C. § 111(a)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3E1.1(a) and (b) | Acceptance of responsibility | <u>-3</u> |
| | **Total** | **17** |

17

*See* Plea Agreement at 2-3. Additionally, as acknowledged by the defendant in the plea agreement, the adjustment pursuant to U.S.S.G. § 4C1.1(a)(3) does not apply. *Id.* at 3.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 47. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 17, Weeks' Guidelines imprisonment range is 24 to 30 months' imprisonment. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Weeks' felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Weeks committed his offense inside the Lower West Terrace tunnel: the site of the most violent and prolonged attacks on police officers on January 6. In the tunnel, Weeks encouraged other rioters to fight the police and enabled them by opening one of the doors separating rioters from police. He also screamed threats at police officers and physically attacked them. Then, after leaving the tunnel, Weeks broke a Capitol building window. The nature and circumstances of Weeks' offense were of the utmost seriousness, and fully support the government's recommended sentence of 27 months' imprisonment.

**B.  The History and Characteristics of the Defendant**

 James Weeks is a 55-year-old former corrections officer who lives in Sodus, New York. PSR at ¶¶ 53, 63. Weeks reported to U.S. Pretrial Services that he had a good childhood, free of abuse, neglect, or poverty. PSR at ¶¶ 56 and 57. Weeks has two adult sons and is divorced. PSR at ¶ 60. Weeks reported being mentally and physically healthy. PSR at ¶¶ 67, 72. Weeks is currently retired but worked for the New York State Department of Corrections for approximately 24 years and the New York City Department of Corrections for approximately 2 years. PSR at ¶ 83, 88. Weeks has no prior arrests or convictions. PSR at ¶ 46, 47.

Weeks' history is both mitigating and aggravating. Weeks had a good upbringing, got an education, and held a stable government job for many years. He has no criminal history. However, these same factors also highlight the many advantages and other choices that Weeks had other than engaging in this violent criminal conduct on January 6. His crimes were not motivated by necessity or poverty. Instead, Weeks committed his crimes because he was angry his candidate didn't win an election.

His prior history as a corrections officer is also aggravating. Weeks held a position of public trust for many years. He worked for the government. He worked in law enforcement. And still, he participated in a violent riot that challenged one of the fundamental aspects of our democracy and government, and physically attacked his fellow law enforcement officers. While everyone in the tunnel should have known that the officers there were just doing their jobs, this should have been especially clear to Weeks. But Weeks not only physically attacked the officers, but he also verbally threatened them, no doubt contributing to the horror of the hours those officers spent defending the U.S. Capitol from attack. Thus, Weeks' history and characteristics support a sentence within

the Guidelines range.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Weeks's criminal conduct on January 6 was the epitome of disrespect for the law. "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20. Weeks' actions on January 6, coupled with his decades of experience as a corrections officer strongly evidence his belief that he is above the law. Under these circumstances, these factors support a sentence within the Guidelines range.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration. There are several factors in this case that

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

indicates the need for the sentence to provide specific deterrence. First, as already discussed, Weeks' actions on January 6, in light of his history as a corrections officer, indicate a belief that Weeks believes he's above the law. Second, Weeks has not expressed any remorse for his conduct on January 6.

E.    **The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.    **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted

21

disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5] "When an offense is uniquely serious,

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[6] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*United States v. Jonathan Grace*, 23-CR-138 (RBW). Grace also committed his crimes inside the Lower West Terrace tunnel on January 6. Specifically, Grace participated in at least one heave-ho push that resulted in an injury to MPD Officer Daniel Hodges and pushed directly up against officers inside the tunnel. Grace spent more time inside the tunnel than Weeks (approximately an hour, entering three different times) but Grace also didn't participate in any property destruction like Weeks. Grace had the same Guidelines range as Weeks and Judge Walton sentenced him to 24 months' incarceration. While Weeks also pushed directly against officers like Grace, Weeks' additional aggravating conduct in the tunnel—namely, verbally threatening officers, encouraging other rioters to push against police, and opening a door that was protecting the police—support a slightly higher sentence for Weeks.

*United States v. Kevin Galetto*, 21-CR-517 (CKK). Galetto was the fifth rioter into the Lower West Terrace tunnel on January 6. He entered the tunnel twice, spending a total of

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

approximately 15 minutes pushing with other rioters against police. Galetto pushed one police officer causing him to fall to the ground and require assistance from other officers. Galetto, like Weeks, also encouraged other rioters to attack the police in the tunnel. Galetto had the same Guidelines range as Weeks. Judge Kollar-Kotelly sentenced Galetto to 27 months' incarceration. While Galetto may have been in the tunnel longer and had two felony convictions, Weeks arguably did greater damage during his time in the tunnel: opening the door for other rioters to attack the police, attacking the police himself and verbally threatening the police. Weeks also engaged in property damage, which Galetto did not. Thus, Galetto's 27-month sentence is also appropriate for Weeks.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer J.M., did not suffer bodily injury as a result of Weeks' assault. However, Weeks did contribute to the damage caused to the window near the Senate Wing Door. As a result, the parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Weeks must pay a total of $2,824 in restitution, which reflects both Weeks's participation in the riot on January 6 and his role in damaging the window.[8] Plea Agreement at 8. $824.00 of that amount represents the cost to repair the window damaged by Weeks. At the time of the plea agreement, the Architect of the Capitol provided an estimate of the damage to the window of $824.00. In preparation for sentencing in this case, the government requested confirmation of the repair costs to the window damaged by Weeks. The Architect of the Capitol then provided an updated estimate which reflected a cost of $774.00.[9]

The remainder of the agreed restitution amount – $2,000 – reflects the cost to repair other damage done to the U.S. Capitol by participants in the riot. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Therefore, the government is now asking that the Court enter a sentence to include a restitution amount of $2,774.00 in this case, consistent with the updated repair costs provided by

---

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[9] The government understands that the defendant has already paid the restitution amount of $2,824.00. The defendant can seek a refund payment from the Architect of the Capitol in the amount of $50.00 following entry of the judgment in this case.

the Architect of the Capitol.

**VIII.   FINE**

The defendant's conviction for a violation of 18 U.S.C. § 111(a) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e).

IX.     **CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months' incarceration, three years supervised release, $2,774 in restitution and a $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     */s/ Kaitlin Klamann*
         KAITLIN KLAMANN
         Assistant United States Attorney
         IL Bar No. 6316768
         601 D Street N.W.
         Washington, D.C. 20530
         Kaitlin.klamann@usdoj.gov